998 P.2d 490

**ALLSTATE INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**Ann M.E. KANESHIRO, Defendant–Appellant,**

and

**Ann M.E. Kaneshiro, Plaintiff–Appellant,**

v.

**Allstate Insurance Company, John Does 1–5; Jane Does 1–5; Doe Partnerships 1–5; Doe Corporations 1–5; Doe Entities 1–5; and Doe Governmental Entities 1–5, Defendants–Appellees.**

No. 22653.

Supreme Court of Hawai'i.

May 4, 2000.

---

Richard B. Miller, Honolulu, and David R. Harada–Stone, San Francisco, CA (of Tom &

Petrus, Honolulu), on the briefs, for Allstate Insurance Co.

Janice P. Kim, Honolulu, and David Allan Feller, on the briefs, for Ann M.E. Kaneshiro.

MOON, C.J., and LEVINSON, NAKAYAMA, and RAMIL, JJ., and Circuit Judge WATANABE, W., Assigned by Reason of Vacancy.

Opinion of the Court by MOON, C.J.

This case arises from a dispute between an insured and her insurer over the insurer's liability for uninsured and underinsured motorist benefits following an automobile accident. Plaintiff-counterclaim defendant-appellee Allstate Insurance Company (Allstate) filed an action in the United States District Court for the District of Hawai'i, seeking a declaratory judgment that defendant-counterclaimant-appellant Ann M.E. Kaneshiro's automobile insurance policy does not include uninsured motorist (UM) coverage or underinsured motorist (UIM) coverage. Kaneshiro filed a counterclaim alleging that: (1) Allstate breached its insurance contract; (2) Allstate engaged in unfair claim settlement practices; (3) Allstate breached the implied covenant of good faith and fair dealing in an insurance contract; and (4) Kaneshiro is entitled to a declaratory judgment that Allstate is obligated to pay insurance benefits to her. Kaneshiro also sought punitive damages.[1] On April 6, 1999, Allstate moved for summary judgment and, on May 20, 1999, Kaneshiro filed a countermotion for partial summary judgment regarding Allstate's liability for UM/UIM benefits.

Allstate contends that Kaneshiro is not entitled to UM/UIM benefits because her husband, Clyde Kaneshiro (Clyde), rejected the optional coverage in March 1993 and that Clyde's rejection constituted a waiver that was binding on Kaneshiro. However, Kaneshiro maintains that, when she was substituted as the sole named insured under the policy in March 1994, Allstate had a duty to offer UM/UIM coverage to her pursuant to Hawai'i Revised Statutes (HRS) § 431:10C–301(d) (1993), which provided that:

An insurer shall offer the insured the opportunity to purchase uninsured motorist coverage and underinsured motorist coverage by offering the following options with each no-fault policy:

(1) The option to stack uninsured motorist coverage and underinsured motorist coverage; and

(2) The option to select uninsured motorist coverage and underinsured motorist coverage, whichever is applicable, up to but not greater than the bodily injury liability coverage limits in the insured's policy.

These offers are to be made when a no-fault policy is first applied for or issued. For any existing policies, an insurer shall offer such coverage at the first renewal after January 1, 1993. *Once an insured has been provided the opportunity to purchase the coverages under the options, no further offer is required to be included with any renewal or replacement policy issued to the insured.*

(Emphasis added). Due to the absence of legal precedent in Hawai'i case law and the lack of guidance in the statute, the federal court certified the following question to this court:[2]

Where a named insured whose spouse is listed as a covered driver under an automobile insurance policy rejects [UM and UIM] coverage in writing in connection with the first renewal of the subject insurance policy after January 1, 1993 and

---

**1.** On the same day that Kaneshiro filed her counterclaim, she filed an action in the first circuit court raising identical claims for relief. Allstate removed that action to federal court. On February 19, 1997, the two parties agreed to consolidate the two actions. After an appeal to the United States Court of Appeals for the Ninth Circuit regarding the district court's jurisdiction, the case was remanded to the district court for a determination on the merits.

**2.** Hawai'i Rules of Appellate Procedure (HRAP) Rule 13(a) (1999) provides:

When a federal district or appellate court certifies to the Hawaii Supreme Court that there is involved in any proceeding before it a question concerning the law of Hawai'i that is determinative of the cause, and that there is no clear controlling precedent in the Hawai'i judicial decisions, the Hawai'i Supreme Court may answer the certified question by written opinion.

thereafter asks the insurer's agent to remove his name from the policy and to substitute his spouse as the named insured under the policy, and an additional vehicle is added to the policy, is the insurer required to offer [UM and UIM] coverage to the new named insured pursuant to [HRS] § 431:10C–301?

Based on the facts of this case, we answer the certified question in the affirmative.

## I. *BACKGROUND*

Clyde first applied for motor vehicle insurance on September 1, 1974 with Allstate agent Raymond Kim. At that time, Allstate issued policy number 007–023–144 (the policy) to Clyde as the named insured, and the policy covered a 1970 Camaro. Four years later, on September 4, 1978, Clyde added a 1969 Oldsmobile to the policy and also added Kaneshiro to the policy as an insured driver and as Clyde's spouse. Subsequently, on December 11, 1990, Allstate offered UM/UIM coverage to Clyde, and he rejected this coverage in writing. Thereafter, he did not pay for, and his policy did not include, UM or UIM coverage.

On March 1, 1993, the first renewal date after January 1, 1993, Allstate again offered UM/UIM coverage to Clyde as required by HRS § 431:10C–301(d). Again, Clyde signed a written rejection of UM/UIM coverage [hereinafter, Clyde's 1993 written rejection]. At this time, Clyde also removed the 1969 Oldsmobile from the policy. A 1983 Toyota was the only car covered under the policy. On September 1, 1993, Clyde renewed the policy under the same terms, i.e., without UM/UIM coverage. Although a renewal policy with an effective date of March 1, 1994 was issued in February 1994, Clyde requested several changes to the policy on March 3, 1994, which were made effective retroactively as of March 1, 1994.

Prior to the changes requested on March 3, 1994, Clyde was the only named insured and the 1983 Toyota was the only insured vehicle on the policy; Kaneshiro and Kristy, Clyde's daughter, were listed as drivers, i.e., additional insureds. On March 3, 1994, Clyde contacted Allstate agent Kim and informed him that he and his wife were no longer living together and in the process of getting a divorce. Clyde told Kim that he wanted his name taken off the policy. Kim asked Clyde to sign a release to delete himself as a named insured. Kaneshiro did not contact Kim in connection with these policy changes. Although disputed by Kaneshiro, Allstate alleges that Clyde was acting as Kaneshiro's agent.

Pursuant to the changes requested by Clyde on March 3, 1994, Kaneshiro was added as a named insured on the policy and an additional vehicle, a 1990 Toyota Corolla, was added to the policy. Five days later, on March 8, 1994, Clyde was removed as a named insured. During this time, Allstate did not offer UM/UIM coverage to Clyde or Kaneshiro, and Kaneshiro did not request or pay for such coverage. Although the changes requested on March 3, 1994 were made over several days, all of the changes were made effective retroactively as of March 1, 1994 and were reflected on a single policy issued on March 8, 1994. Thus, on the policy effective as of March 1, 1994, Kaneshiro was the sole named insured, the insured vehicles included the 1983 Toyota and the 1990 Corolla, and the policy number remained the same.

On September 1, 1994, Kaneshiro renewed the policy for a six-month period. The only change to the policy was the addition of another vehicle. On September 10, 1994, Kaneshiro was involved in an automobile accident. Allstate paid no-fault benefits in the amount of $16,103.62 to Kaneshiro for her accident-related injuries.

In addition to the no-fault benefits, Kaneshiro made a claim for UM/UIM benefits. As previously stated, Allstate filed suit in the federal district court, seeking a declaration that Kaneshiro's policy did not include UM/UIM coverage on the date of the accident because Clyde's 1993 written rejection was legally sufficient and binding on Kaneshiro. Kaneshiro filed a counterclaim in the federal district court case and a separate action in the first circuit court. The state action was subsequently removed to federal court, and the two cases were consolidated. Both parties moved for summary judgment regarding Allstate's liability for UM/UIM benefits, re-

sulting in the certified question now before this court.

## II. *DISCUSSION*

As indicated above, Allstate contends that Kaneshiro is not entitled to UM/UIM benefits because Clyde's 1993 written rejection of such benefits constituted a waiver of UM/UIM coverage and was binding on Kaneshiro. Kaneshiro contends that Allstate was required to make a new offer of UM/UIM coverage to her as the new named insured on the policy.

### A. *The UM/UIM Statute*

In answering the certified question presented, our primary task is one of statutory construction.

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....
>
> In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.
>
> This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning. Laws in *pari materia*, or upon the same subject matter,

shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*Taylor v. Government Employees Ins. Co.*, 90 Hawai'i 302, 306, 978 P.2d 740, 744 (1999) (citations and internal quotation marks omitted).

Former HRS § 431:10C–301 (1993),[3] which was the statute in effect as of the policy's effective date, governs the policy at issue and is part of the contract with full binding effect upon each party. *See AIG Hawaii Ins. Co., Inc. v. Estate of Caraang*, 74 Haw. 620, 633, 851 P.2d 321, 328 (1993); *see also Taylor*, 90 Hawai'i at 307, 978 P.2d at 745. Pursuant to HRS § 431:10C–301(d), "an insurer shall offer [UM/UIM] coverage at the first renewal after January 1, 1993." Thereafter, "[o]nce an insured has been provided the opportunity to purchase the coverages under the options, no further offer is required to be included with any renewal or replacement policy issued to the insured." HRS § 431:10C–301(d).

Both parties agree that: (1) the form used by Allstate to record Clyde's 1993 written rejection of UM/UIM coverage is legally sufficient; (2) Clyde's waiver of UM/UIM coverage was valid as to him; and (3) once Clyde declined UM/UIM coverage in writing, HRS § 431:10C–301 imposed no duty on Allstate to offer such coverage on *any renewal or replacement policy issued to him*. The parties disagree on whether Allstate had a duty to offer UM/UIM coverage to Kaneshiro at the time she became the sole named insured on the policy.

Allstate contends that, under HRS § 431:10C–301(b),[4] (1) UM/UIM coverage shall not apply where "any named insured" rejects UM/UIM coverage in writing and (2) such rejection constitutes a waiver of coverage binding on all additional insureds seeking recovery under the policy. Thus, Allstate

---

3. All references to HRS § 431:10C–301 in this opinion shall be to the 1993 version, unless otherwise specified.

4. HRS § 431:10C–301(b)(3) provided in pertinent part that "the coverage required under this paragraph [including UM coverage] shall not be applicable where any named insured in the poli-

cy shall reject the coverage in writing[.]" HRS § 431:10C–310(b)(4) provided that the requirements for sufficient offers and rejections of both UM and UIM coverage are the same. *See also Mollena v. Fireman's Fund Ins. Co.*, 72 Haw. 314, 325, 816 P.2d 968, 973 (1991).

maintains that Kaneshiro was bound by Clyde's 1993 written rejection of UM/UIM coverage. It is undisputed that Clyde's 1993 written rejection precluded Kaneshiro from claiming UM/UIM benefits as an insured under the policies issued to Clyde on March 1, 1993 and September 1, 1993. However, Kaneshiro contends that the policy *issued to her* in March 1994 was a "new" policy, and that, therefore, Allstate was required to offer *her* the opportunity to purchase or reject UM/UIM coverage. Because Allstate failed to do so, Kaneshiro maintains that, pursuant to *Mollena*, she is entitled to receive UM/UIM benefits. *See Mollena*, 72 Haw. at 320, 816 P.2d at 971 (where an insurer fails to make a legally sufficient offer of UM coverage to an insured, coverage is implied as a matter of law). Conversely, Allstate argues that the March 1994 policy was a "renewal or replacement" of the policy originally issued to Clyde and that, therefore, based on Clyde's 1993 written rejection, Allstate had no duty to offer the optional UM/UIM coverage to Kaneshiro.

Accordingly, the dispositive issue in this case is whether the March 1994 policy issued to Kaneshiro was a "renewal or replacement" policy within the meaning of HRS § 431:10C–301(d) or a policy requiring a new offer of UM/UIM coverage.

B. *"Renewal or Replacement Policy"*

Hawaii's Motor Vehicle Insurance Code does not define the terms "renewal or replacement policy," *see* HRS § 431:10C–103 *et seq.*, and the language of HRS § 431:10C–301 does not provide guidance as to the meaning of these terms. However, HRS § 431:10–226 (1993), regarding renewal of insurance contracts, generally, provides:

**Renewal of policy; new policy not required.** At the option of the insurer, any insurance policy terminating at a specified expiration date and not otherwise renewable, may be renewed or extended, upon a currently authorized policy form and at the premium rate then required for a specific additional policy period or periods by a certificate or by endorsement of the policy. The issuance of a new policy is not required.

Thus, a "renewal policy" may be defined as a policy that, on the termination date of an existing policy, extends the same coverage for an additional specified time. *See* HRS § 431:10–226; *Couch on Insurance 3d*, 29:1 at 29–4 ("[T]he term 'renewal' means that the original policy shall be repeated in substance, it having the same significance in this connection as the word 'extended,' and renewal implies a fixed contract at the expiration of the original coverage." (footnotes omitted.)); *State Farm Mut. Auto. Ins. Co. v. Arms*, 477 A.2d 1060, 1065 (Del.1984) (renewal is "merely the automatic continuation of the preceding policy, identical in form and substance, except as to date, and perhaps, the premium").

Because Hawaii's insurance code contains no statutory definition of the term "replacement policy," we look to other jurisdictions for guidance. In *Burnett v. Safeco Insurance Company of Illinois*, 227 Ill.App.3d 167, 169 Ill.Dec. 113, 590 N.E.2d 1032 (1992), *appeal denied*, 146 Ill.2d 623, 176 Ill.Dec. 793, 602 N.E.2d 447 (1992), the Illinois Appellate Court construed a section of the Illinois Insurance Code analogous to HRS § 431:10C–301(d), which provided that, once an insured rejects optional UM coverage,

the insurer need not offer in any renewal, reinstatement, reissuance, substitute, amended, replacement or supplementary policy, coverage in excess of that elected by the insured in connection with a policy previously issued to such insured by the same insurer unless the insured subsequently makes a written request for such coverage.

*Id.* 169 Ill.Dec. 113, 590 N.E.2d at 1036–37 (holding that statutory exclusions did not apply and insurer was required to make a new offer of coverage where daughter, previously insured on parents' policy, applied for policy listing daughter as sole named insured and covering different vehicle). The *Burnett* court defined "replacement policy" by using the "well-known legal significance" of the term "replace," which means "to supplant with substitute or equivalent." *Id.* 169 Ill. Dec. 113, 590 N.E.2d at 1037 (citing Black's Law Dictionary 1168 (5th ed.1979)).

In *Lewis v. Lenard,* 694 So.2d 574, 577 (La.Ct.App.1997), the Louisiana Court of Appeals analyzed a section of the Louisiana UM statute, which provided that, after a valid waiver by the named insured, no new offer of coverage is required for a "renewal, reinstatement, or substitute policy" issued to the insured by the same insurer. *Id.* at 577. Although the terms of the Louisiana statute differ from HRS. § 431:10C–301,[5] the *Lewis* court's discussion of when a new offer of coverage is required is nevertheless useful to our analysis. *Id.* at 576–77. Therein, the court acknowledged that a new offer of coverage is not required with every policy change, but only when there is a material change in the policy. *Id.* at 577. The court stated that:

> Regardless of whether any change in policy terms may occur at the time of renewal or reinstatement, the event of a substitute policy clearly must encompass some change. In this regard, we do not view "substitute policy" to mean only that some type of actual substitution of vehicles or insureds must occur. The deletion of [a named insured] from the policy in this instance was a change in the policy which can be said to have resulted in a substitute policy. *The determinant question is whether the change in the policy is material to the initial selection or waiver of UM coverage that would require the execution of a new selection or waiver.*

*Id.* (emphasis added).

Several other jurisdictions, with analogous statutes, have also adopted a materiality standard to determine whether policy changes made after an initial rejection of UM/UIM coverage required a new offer of such coverage. *See, e.g., Torgerson v. State Farm Mut. Auto. Ins. Co.,* 91 Wash.App. 952, 957 P.2d 1283, 1286 (1998) (stating that material change standard applied to the interpretation of Washington statute, which provides that no new offer was required in any "renewal or replacement" policy) (citing *Johnson v. Farmers Ins. Co. of Washington,* 117 Wash.2d 558, 817 P.2d 841, 848 (1991)); *Arms,* 477 A.2d at 1064–65 (applying material

change standard based on Delaware statute that provided UM coverage was not required on any policy where coverage is rejected in writing, or upon any "renewal" of such policy); *Kerr v. State Farm Mut. Auto. Ins.,* 434 So.2d 970, 971 (Fla.Dist.Ct.App.1983) (applying material change standard under former Florida statute, which provided that coverage need not be provided in, or supplemental to, a "renewal" policy where the named insured had rejected the coverage in connection with a policy previously issued to him by the same insurer) (cited with approval in *Johnson,* 817 P.2d 841); *but see Atlanta Casualty Co. v. Evans,* 668 So.2d 287, 289–90 (Fla.Dist.Ct. App.1996) (application of "material" change standard precluded after amendment to Florida statute, which provided that, after a valid rejection "on behalf of all insureds under the policy," coverage need not be provided when "an existing policy" is "renewed, extended, changed, superseded, or replaced by any other policy having the same bodily injury liability limits as the previous policy" (internal quotation marks and brackets omitted)); *Allstate Ins. Co. v. Parfrey,* 830 P.2d 905, 912–14 (Colo.1992) (in the absence of a statutory definition of "replacement" policy, the court (1) rejected the materiality standard, (2) defined replacement policy as "a policy issued to replace a prior policy that has been lost or destroyed, or a new policy which, with the knowledge and agreement of the insured, incorporates provisions different from those in a prior policy," and (3) adopted a totality of the circumstances test to determine whether insurer had discharged its duty to notify the insured of the availability of UM/UIM coverage).

Among states adopting a materiality standard, courts generally agree that the inquiry into whether changes to a policy are material requires a fact specific determination. *See, e.g., Torgerson,* 957 P.2d at 1286 ("The fact specific question is: Have there been material changes in coverage which make the policy a 'new' policy?") (citing *Johnson,* 817 P.2d at 848–49). Courts, however, disagree as to what constitutes a material change that requires a new offer of coverage.

**5.** We note that the Louisiana statute defines renewal policy as a "replacement policy" issued at

the end of the prior policy period. *Lewis,* 694 So.2d at 577.

In *Johnson*, the Washington Supreme Court analyzed a UM statute, which provided that, after a valid rejection of coverage by the "named insured or spouse," no new offer was required in any renewal or replacement policy. 817 P.2d at 843 n. 2 and 848–49. The *Johnson* court held that the substitution of a spouse as a named insured and the substitution of a new vehicle for one previously covered, both upon the request of the spouse, did not require a new offer of UM coverage. *Id.* at 848. The court also explained that, "[w]hile the continuation of the same policy number is not determinative on the issue of whether a policy is new or only a renewal of an existing policy, the fact that no changes in coverage limits are made is consistent with the act of continuation of the policy." *Id.*; *see also Lewis*, 694 So.2d at 577 (stating that a change in policy numbers does not necessarily indicate a new policy has been issued rather than a renewal or substitute policy).

In *Kerr*, the Florida District Court of Appeal held that the substitution of a widow as the named insured on her deceased husband's policy, where the coverage levels and the vehicle remained the same, was not a material change. 434 So.2d at 971 (the court's holding was based on a statute that provided that no new offer of coverage was required with a renewal policy); *but see Evans*, 668 So.2d at 289–90 (rejecting "material change" standard based on subsequent amendment to Florida statute). In *Makela v. State Farm Mutual Automobile Insurance Company*, 147 Ill.App.3d 38, 100 Ill.Dec. 505, 497 N.E.2d 483 (1986), the Illinois Appellate Court did not expressly adopt the materiality standard, but held that, where the named insured remained the same, the addition of a vehicle to a multi-vehicle policy did not require a new offer of coverage. *Id.* 100 Ill. Dec. 505, 497 N.E.2d at 490–91. The *Makela* court's holding was based upon, *inter alia*, the legal significance of a multi-vehicle policy and the principle that the insurance contract is personal to the insured, *i.e.*, that it insures his risk of loss as a car owner and does not attach to specific vehicles. *Id.* 100 Ill.Dec. 505, 497 N.E.2d at 489–91; *Maxwell v. United States Fidelity and Guar. Co.*, 399 So.2d 1051, 1054–55 (Fla.Dist.Ct.App.1981) (addi-

tion of a vehicle to a "fleet" policy covering 40–50 vehicles was not material change).

In Louisiana, however, courts have held that the addition of a new insured or even a single vehicle may be a material change requiring a new offer of UM coverage. *See, e.g., Matheny v. Glen Falls Ins. Co.*, 152 F.3d 348, 354 (5th Cir.1998) (under Louisiana's statute, addition of insured driver resulting in increased premiums was a material change); *Donaghey v. Cumis Ins. Society*, 600 So.2d 829, 831 (La.Ct.App.1992) (the addition of single vehicle, without a change in bodily injury limits, increased the policy's coverage and thus, required a new offer); *but see Daigle v. Allstate Ins. Co.*, 690 So.2d 261, 262 (La.Ct.App.1997) (in multi-vehicle policy where the number of cars remained the same, substitution of newer vehicles for the old and change of status of insured passenger to insured driver were not material changes); *Wilkinson v. Louisiana Indemnity/Patterson Ins.*, 682 So.2d 1296, 1300 (La. Ct.App.1996) (because husband's addition of wife as a named insured did not have the effect of increasing coverage, no new offer was required). Similarly, the Delaware Supreme Court, in *State Farm Mutual Insurance Company v. Arms*, 477 A.2d 1060 (Del. 1984), held that changing the insured vehicle and the coverage amounts constituted material changes, altering the legal relationships of the parties. *Id.* at 1065.

Based on the foregoing, we are persuaded that, when a material change is made to an existing policy, the resulting policy is not a "renewal or replacement policy" and a new offer of optional UM/UIM coverage is required. Further, we recognize that the inquiry into whether changes are material is a fact specific determination to be made based upon the totality of the circumstances. However, given the disparate statutes and varying applications of the "material" change standard discussed above, we must look to the legislative history and public policies underlying Hawaii's UM/UIM statutes to determine whether the changes at issue in the instant case—removing Clyde as a named insured, substituting Kaneshiro as the sole named insured after Allstate had notice that Kaneshiro was no longer Clyde's resident

spouse, and adding a vehicle to the policy—in combination, constituted a material change to the policy, thereby requiring a new offer of UM/UIM coverage.

## C.  *Public Policy*

This court reviewed the legislative history of the UM/UIM statute, HRS § 431:10C–301, in *Taylor v. Government Employees Insurance Co.*, 90 Hawai'i 302, 978 P.2d 740 (1999), stating:

> The current UIM statute, HRS § 431:10C–301 (1993 & Supp.1998), had its genesis in the 1985 legislative session as Senate Bill No. 389, which was intended to "provide a new optional 'underinsured' motorist coverage under [the] no-fault law" and thereby further "the overall intent of the no-fault law to provide speedy and adequate protection to persons injured in motor vehicle accidents at the least possible cost." Sen. Stand. Comm. Rep. No. 689, in 1985 Senate Journal, at 1181. . . .  The UIM law achieved its substantially current form in 1988. . . .  The 1988 amendments to HRS § 431:10C–301 mandated that UIM coverage be included in all no-fault auto insurance policies sold in Hawai'i unless the insured rejected such coverage in writing. *See* Hse. Stand. Comm. Rep. No. 1150–88, in 1988 House Journal, at 1248; Sen. Stand. Comm. Rep. No. 215, in 1988 Senate Journal, at 675.  In its report on the proposed amendments, the House Committee on Consumer Protection and Commerce noted:
>
>> The purpose of this bill is to require insurers to offer coverage for underinsured motor vehicles in motor vehicle insurance policies.  Underinsured motorist coverage would then be treated in the same manner that uninsured motorist coverage is presently treated, i.e., to provide protection, through voluntary insurance, for persons who are injured by underinsured motorists whose liability polic[i]es are inadequate to pay for personal injuries caused by motor vehicle accidents. . . .
>>
>> . . . .
>>
>> Your committee received testimony in favor of this bill, but there were concerns expressed that insureds were not being offered underinsured motorist coverage by certain insurers.  To alleviate the problem it was suggested that the bill should provide that, unless the named insured rejects the coverage in writing, the additional underinsured motorist coverage will be included in the policy.  Your committee has, accordingly, amended the bill to provide for the written rejection by the insured in the same manner as is presently required for uninsured motorist coverage.
>
> Hse. Stand. Comm. Rep. No. 1150–88, at 1248.  Thus, like the uninsured motorist statutes, HRS § 431:10C–301(b)(4) is a remedial statute that must be liberally construed "in order to accomplish the purpose for which [it] was enacted. . . .  [Remedial] statutes are liberally construed to suppress the [perceived] evil and advance the [enacted] remedy."  *See Estate of Doe [v. Paul Revere Ins. Group]*, 86 Hawai'i [262,] 273, 948 P.2d [1103,] 1114 [ (1997) ] (quoting *Dawes [v. First Ins. Co. of Hawai'i, Ltd.]*, 77 Hawai'i [117,] 122–23, 883 P.2d [38,] 43–44 [ (1994) ] ) (some brackets in original and some added) (internal quotation signals omitted).

*Id.* at 307, 978 P.2d at 745–47 (footnote omitted).  The 1988 amendments to section (b) of HRS § 431:10C–301 also "clarified" *how* offers of UM/UIM coverage were to be made: "[B]oth such offers shall be conspicuously displayed so as to be readily noticeable by the insured and clearly identified with the premium offer, easily subtracted from the total premium due, and provision is made for written rejection of the coverages adjacent to or directly below the offer."  Sen. Conf. Comm. Rep. No. 215, in 1988 Senate Journal, at 675.  When further amendments to the UM/UIM statute were made in 1992, eliminating certain coverage requirements in an effort to lower the cost of motor vehicle insurance, policymakers emphasized that "[t]his trade-off between the elimination of stacking and these optional coverages will be equitable only if consumers are fully informed of their loss of rights and ability to protect themselves through voluntary additional options at nominal cost[.]"  Hse. Conf.

Comm. Rep. No. 150, in 1992 House Journal, at 878. Thus, the requirements for how offers are to be made reflect the legislature's intent to ensure that policyholders are offered coverage and that the rejection of coverage is a fully informed decision. The test for a legally sufficient offer set forth in *Mollena v. Fireman's Fund Insurance Co.*, 72 Haw. 314, 816 P.2d 968 (1991), also reflects this purpose:

> [A]n offer is legally sufficient when all of the following are met: (1) if made other than face-to-face, the notification process must be commercially reasonable; (2) the limits of optional coverage must be specified and not merely offered in general terms; (3) the insurer must intelligibly advise the insured of the nature of the optional coverage; and (4) the insurer must apprise the insured that the optional coverage is available for a relatively modest increase in premium.

*Id.* at 320, 816 P.2d at 971; *see also Britt v. United States Auto. Ass'n*, 86 Hawai'i 511, 517, 950 P.2d 695, 701 (1998) (holding that offer of stacked coverage was not legally sufficient under *Mollena* test).

Subsection (d) of HRS § 431:10C–301 reflected a series of statutory changes as to *when* offers of UM and UIM coverage were required to be made. Under HRS § 431–448, the predecessor of HRS § 431:10C–301, UM coverage was required to be offered when the policy was "delivered, issued for delivery, or renewed." *See Mollena*, 72 Haw. at 325, 816 P.2d at 973. In 1992, the legislature amended HRS § 431:10C–301 by inserting subsection (d), which provided that "written rejection [of UM/UIM coverage] shall only be required when the policy is first

issued or first renewed. No further rejections are required." 1992 Haw. Sess. L. Act 123, § 4 at 209. The 1992 amendments, generally, were enacted to "reduc[e] and stabiliz[e] the soaring cost of motor vehicle insurance[.]" Sen. Conf. Comm. Rep. No. 161, in 1992 Senate Journal, at 825; Sen. Stand. Comm. Rep. No. 2201, in 1992 Senate Journal, at 1018; Hse. Stand. Comm. Rep. No. 1271–92, in 1992 House Journal, at 1390. The 1993 version of the statute applicable here provided that, "[o]nce an insured has been provided the opportunity to purchase the [UM/UIM] coverages under the options, no further offer is required to be included with any renewal or replacement policy issued to the insured." [6]

Requiring the insurer to make a new offer of coverage when a material change is made to the policy is consistent with the legislative intent to ensure that (1) policyholders have the opportunity to purchase or reject UM/UIM coverage, (2) policyholders make fully informed decisions when selecting coverage, and (3) once the insured has made an informed decision, insurers need not incur the additional cost of making a new offer when the policy is merely a renewal or replacement, *i.e.*, when no material change is made to the policy.

We have also acknowledged that the UM/UIM policy is personal to the named insured; the coverage attaches to the insured person, not the insured vehicle. *Dines v. Pacific Ins. Co., Ltd.*, 78 Hawai'i 325, 327, 893 P.2d 176, 178 (citing *Palisbo v. Hawaiian Ins. & Guaranty Co., Ltd.*, 57 Haw. 10, 15, 547 P.2d 1350, 1355 (1976)), *reconsideration denied*, 78 Hawai'i 474, 896 P.2d 930 (1995).

---

**6.** In 1997, subsection (d) was amended to its current form as follows:

> An insurer shall offer the insured the opportunity to purchase uninsured motorist coverage and underinsured motorist coverage by offering the following options with each [no fault] *motor vehicle insurance* policy:
>
> (1) The option to stack uninsured motorist coverage and underinsured motorist coverage; and
>
> (2) The option to select uninsured motorist coverage and underinsured motorist coverage, whichever is applicable, up to but not greater than the bodily injury liability coverage limits in the insured's policy.

> These offers are to be made when a [no-fault] *motor vehicle insurance* policy is first applied for or issued. For any existing policies, an insurer shall offer such coverage at the first renewal after January 1, 1993. Once an insured has been provided the opportunity to purchase *or reject* the coverages *in writing* under the options, no further offer is required to be included with any renewal or replacement policy issued to the insured.

> 1997 Haw. Sess. L. Act 251, § 38 at 535 (emphasis in original).

Thus, in determining whether a new offer of coverage is required, *i.e.,* whether there has been a material change to an existing policy, we must consider how the change affects the legal relationship and obligations between the insurer and insured. However, changing the identity of the named insured, in and of itself, may not necessarily constitute a material change to the policy. The change of the named insured must have a significant impact on the legal relationship and obligations between insurer and insured under the policy, and the impact of that change must be considered in light of any other changes in the policy and the public policies discussed herein. We reiterate that the inquiry into whether changes are material requires consideration of the totality of the circumstances in each case.

Lastly, "we have long subscribed to the principle that [insurance policies] must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer ... [;] policies are to be construed in accord with the reasonable expectations of a layperson." *Taylor*, 90 Hawai'i at 307, 978 P.2d at 745 (citations, internal quotation marks, and brackets in original omitted).

D. *The Policy Changes At Issue*

▆▆▆ In our view, the changes to the policy in March 1994 altered the legal relationship between Allstate and Clyde *and* the legal relationship between Allstate and Kaneshiro. As previously stated, UM/UIM insurance policy is personal to the named insured. *Dines*, 78 Hawai'i at 328, 893 P.2d at 179. At the time of Clyde's 1993 written rejection, Kaneshiro was covered under the policy as a listed driver of the insured vehicle and as Clyde's resident spouse.[7] As the then-sole named insured, the coverage was personal to *Clyde*, and he made the decisions regarding

coverage. However, in March 1994, when (1) Clyde was deleted from the policy, (2) Kaneshiro was substituted as the sole named insured, and (3) Allstate received notice that Kaneshiro was no longer Clyde's resident spouse because of their pending divorce, the coverage became personal to *Kaneshiro,* and *her* risk of loss was insured. Thus, the legal relationship and obligations between Allstate and Kaneshiro were significantly impacted. We note that the legal relationship among Allstate, Kaneshiro, and Clyde would not have been significantly impacted had Clyde remained on the policy as a named insured and merely added Kaneshiro as an additional named insured while Kaneshiro was Clyde's resident spouse. Although the impact on the legal relationship and obligations between Allstate and Kaneshiro weighs in favor of finding a material change to the policy, our analysis does not end here.

Not only was there a change of named insured, but also regarding the vehicles covered. Prior to the changes in March 1994, the policy covered only a single vehicle. As a result of the addition of the 1990 Toyota in March 1994, the policy included a multi-vehicle rate and the premium increased from $469.00 to $737.00.[8] The addition of the 1990 Toyota was not merely a substitution of one vehicle for another under the policy. *Compare Daigle v. Allstate Ins. Co.*, 690 So.2d 261, 262 (La.Ct.App.1997).

Moreover, inasmuch as Clyde went to see the insurance agent face-to-face to request several changes to the policy and the changes were made over several days, we believe that making a new offer of UM/UIM coverage during that time to Kaneshiro would not have entailed a significant burden on Allstate's part. Allstate did not simply reissue a policy with the same terms on the same property.

Thus, based on the totality of the circumstances present in this case and the public

---

7. A UM policy covers the named insured's resident spouse. *Cf. Palisbo,* 57 Haw. at 15, 547 P.2d at 1356 (recognizing that "[t]he uninsured motorist policy is personal to the insured. This is what he bargained for[.]"). In *Palisbo,* the court also discussed the legislative history of HRS § 431–448, the predecessor statute, and stated the "statute was clearly designed to enable the purchaser of ... [UM] insurance to assure himself and the members of his household of not less than the minimum protection[.]" *Id.* (citing

Hse. Stand. Comm. Rep. No. 194, in 1965 House Journal, at 582 ("An insurance company offering uninsured motorist protection engages to pay to the insured, spouse or minor children of either, *resident in the named insured's household,* sums....") (Emphasis added.)).

8. *See* Allstate's Separate and Concise Statement of Material Facts in Support of Its Motion for Summary Judgment, Exhibit 9, Civ. No.96–01140DAE, File 2, doc. 20.

policy underlying Hawaii's Motor Vehicle Insurance Code, we hold that the changes to the policy made in March 1994—removing Clyde as the named insured, substituting Kaneshiro as the sole named insured after Allstate had notice that Kaneshiro was no longer Clyde's resident spouse due to their pending divorce, and adding a vehicle under the policy—taken together, constituted a material change to the pre-existing policy. The policy issued to Kaneshiro in March 1994 was not merely a renewal or replacement of the policy issued to Clyde, and, therefore, Allstate was required to make a new offer of UM/UIM coverage to Kaneshiro.

It is undisputed that Allstate did not offer Kaneshiro the opportunity to purchase or reject the optional coverage. Furthermore, because Allstate made no new offer to Clyde at the time the changes were made in March 1994, the question whether Clyde was acting as Kaneshiro's agent is irrelevant.

### III. *CONCLUSION*

Based on the foregoing, we hold that, when an insured makes a material change to an existing policy after a valid rejection of coverage, the resulting policy is not a renewal or replacement policy within the meaning of HRS § 431:10C–301(d), and a new offer of coverage is required. The inquiry into whether a material change was made is a fact specific determination based on the totality of the circumstances that includes consideration of the public policies underlying Hawaii's Motor Vehicle Insurance Code.

Based on the facts of this case, we hold that the changes made to the policy in March 1994 were material and that, therefore, Allstate was required to make a new offer of UM/UIM coverage to Kaneshiro.