2011 UT 34

Joni M. IVERSON, individually and as personal representative for the Estates of Carter and Glenada Iverson, Plaintiff and Appellant,

v.

STATE FARM MUTUAL INSURANCE CO., Defendant and Appellee.

No. 20081016.

Supreme Court of Utah.

July 1, 2011.

James R. Hasenyager, Peter W. Summerill, Ogden, for plaintiff.

Paul M. Belnap, Stuart H. Schultz, Andrew D. Wright, Andrew B. McDaniel, Salt Lake City, for defendant.

Justice NEHRING, opinion of the Court:

## INTRODUCTION

¶ 1 We have accepted certification of the following question from the United States District Court for the District of Utah: "Whether provision of lower limits for underinsured motorist coverage than for liability coverage properly complies with former Utah Code Ann. § 31A–22–305(9)(b) & (g) (currently codified under Utah Code Ann. § 31A–22–305.3)." We hold that such coverage may comply with the Utah Code so long as the insurer satisfies the consumer notification requirements contained in section 31A–22–305(9)(b) and (g) (the "UIM Statute").[1] Because notification requirements differ depending on when the insured's policy was issued, a court must first determine whether a new policy existed on or after January 1, 2001. We hold that a new policy exists on or after this date when the insurer and the insured enter into a new contractual relationship, or if changes are made to the terms of an existing insurance contract that materially alter the levels of risk contained in the contract.

## BACKGROUND

¶ 2 Carter and Glenada Iverson (the "Iversons") were insured by State Farm Mutual Insurance Company ("State Farm") for over twenty years. The Iversons purchased their first policy with State Farm in 1981 for coverage of a 1981 Pontiac Firebird under policy number 479 7848–804–44. In 1990, the Iversons replaced their Firebird with a 1984 Dodge van, and both their policy and policy number were updated to reflect this change. In March 1997, because the Iversons' contractual relationship with State Farm lapsed for a period of time, State Farm issued a new policy number: 479 7848–804–44B. In August 1997, State Farm terminated that policy and reinstated the Iversons' coverage under policy number 479 7848–804–44C. In October 1997, the Iversons added a new vehicle to their policy, a 1995 Chevy van, and State Farm issued policy number 479 7848–804–44D along with that change. Also in 1997, the Iversons changed the principal driver on the policy from Carter Iverson to his son, Rex Iverson, a change that increased the Iversons' premium from $162.90 to $350.02.

¶ 3 On February 27, 2001, State Farm sent the Iversons a renewal notice with an insert that informed the Iversons of the costs and benefits associated with uninsured motorist ("UM") and underinsured motorist ("UIM") coverage. State Farm sent the Iversons the same insert again in their next four renewal notices in August 2001, February 2004, August 2004, and February 2005.

¶ 4 In August 2001, State Farm changed its Policy Booklet Form, a form that was incorporated into all of the policies it issued, and added a new policy number in its statement to the Iversons: 479 7848–804–44E. And in April 2003, the Iversons added a 2001 PT Cruiser as an additional vehicle to their coverage, and State Farm issued a new policy number to reflect this final change: 479 7848–804–44F.

¶ 5 At no point during its twenty-four year insurance relationship with the Iversons did

---

1. Utah Code Ann. § 31A–22–305(9)(b), (g) (Supp. 2000). Although the most relevant subsections of this statute have not changed significantly since the events in this case, because there have been significant changes to substantive require-ments under other parts of this statute, throughout this opinion we refer to the version in place at the time of the relevant events. The current version of the statute is found at Utah Code Ann. § 31A–22–305.3 (2010).

State Farm obtain a written waiver from either Carter or Glenada Iverson affirmatively authorizing State Farm to issue the Iversons UIM coverage in an amount less than their liability coverage.

¶ 6 In July 2005, Carter and Glenada Iverson were killed in a head-on collision with an underinsured motorist while driving the 2001 PT Cruiser covered by their policy with State Farm. Joni Iverson, as personal representative of the Iversons' estate, requested that State Farm provide UIM coverage in an amount equal to the liability policy limits of $50,000 for one person and $100,000 for two or more persons. State Farm instead offered $20,000, the limit under the Iversons' policy as written for UIM claims. As a result of this discrepancy, Joni Iverson sued State Farm in the United States District Court for the District of Utah.

¶ 7 Ms. Iverson argues that State Farm was required to obtain a written waiver under Utah Code section 31A–22–305(9)(b) before it could provide UIM coverage in an amount less than the liability policy limits because the changes made to the Iversons' policy since January 1, 2001, made that policy a "new policy" under the UIM Statute. State Farm does not dispute that it did not obtain a written waiver from the Iversons. Instead, State Farm claims that a written waiver was not required because it never issued the Iversons a new policy. The federal district court certified the following question for our resolution: "Whether provision of lower limits for underinsured motorist coverage than for liability coverage properly complies with former Utah Code Ann. § 31A–22–305(9)(b) & (g) (currently codified under Utah Code Ann. § 31A–22–305.3)." We have jurisdiction under Utah Code section 78A–3–102(1) (Supp.2010).

## STANDARD OF REVIEW

¶ 8 "A certified question from the federal district court does not present us

with a decision to affirm or reverse a lower court's decision; as such, traditional standards of review do not apply. On certification, we answer the legal questions presented without resolving the underlying dispute."[2]

## ANALYSIS

¶ 9 The federal district court has asked us to determine whether an insurer may provide lower limits for underinsured motorist coverage than for liability coverage under Utah law. We hold that such coverage may comply with Utah law so long as the insurer follows the consumer notification requirements contained in the Utah Code. We approach the federal district court's question by first examining the UIM Statute's notification requirements and explaining why those requirements necessitate a determination of whether a new policy was created on or after January 1, 2001. We then analyze the meaning of "new policy" under the UIM Statute. We conclude that the meaning of "new policy" includes not only new contractual relationships but also material changes that are made to existing policies. Finally, we explain how a court determines when material changes to an existing insurance policy create a "new policy" for which the statute requires insurers to obtain a signed waiver of UIM motorist coverage.

## I. A COURT MUST FIRST EXAMINE WHETHER A POLICY WAS CREATED ON OR AFTER JANUARY 1, 2001, TO DETERMINE WHETHER AN INSURER HAS COMPLIED WITH THE UIM STATUTE'S CONSUMER NOTIFICATION REQUIREMENTS

¶ 10 The Utah Code requires that an insurer take different actions regarding UIM coverage based on when the policy was created. As a result, a court must first determine whether a "new policy" existed on or after January 1, 2001, before it can ascertain

---

**2.** *Egbert v. Nissan N. Am., Inc.*, 2007 UT 64, ¶ 7, 167 P.3d 1058 (internal quotation marks and footnote omitted). State Farm has moved to supplement the record with several documents in response to an argument by Ms. Iverson that certain changes to State Farm's policy form

make the policy a "new policy" written after January 1, 2001. Because we answer only the certified question and do not resolve the underlying dispute, we need not reach State Farm's motion.

whether an insurer has complied with the UIM Statute.

¶ 11 When we interpret Utah statutes,

> Our primary goal ... is to evince the true intent and purpose of the Legislature. We do so by first looking to the statute's plain language, and giv[ing] effect to the plain language unless the language is ambiguous.... [W]e read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters.[3]

¶ 12 The language of both the 2000 and more recent versions of the UIM Statute is clear: insurance policies existing before January 1, 2001, trigger different UIM coverage notification requirements than do new policies written on or after that date. Utah Code section 31A–22–305(9)(b) governs "new policies written on or after January 1, 2001," and Utah Code section 31A–22–305(9)(g) governs policies that existed before that date. Under section 9(b), new policies written on or after January 1, 2001, must provide UIM coverage with limits "equal to the lesser of the limits of the insured's motor vehicle liability coverage or the maximum [UIM] coverage limits available by the insurer under the insured's motor vehicle policy, *unless* the insured purchases coverage in a lesser amount by signing an acknowledgment form ... that waives the higher coverage."[4] That acknowledgment form must "reasonably explain[ ] the purpose of [UIM] coverage" and "disclose[ ] the additional premiums required to purchase [UIM] coverage" equal to the policy's liability coverage or the maximum limit available by the insurer under the policy, whichever is less.[5] Without the waiver, the UIM Statute mandates that the UIM coverage limits of these new policies "*shall be equal to*" the lesser of either the policy's liability limits or the maximum limit the insurer provides under that policy.[6]

¶ 13 In contrast, section 9(g) of the UIM Statute provides that written waivers are not required for insurers to provide UIM coverage with lower limits than the policy's liability limits if the policy is not "new" as of January 1, 2001. Instead, the statute requires only that insurers send with the first 2 renewal notices after January 2001, "an explanation of the purpose of [UIM] coverage and the costs associated with increasing the coverage in amounts up to and including the maximum amount available by the insurer under the insured's motor vehicle policy."[7]

¶ 14 Because the consumer notification requirements differ depending on whether a new policy was created on or after January 1, 2001, the definition of "new policy" becomes central to determining the insurer's obligations under the statute. We now explain the meaning of this term.

## II. A POLICY IS "NEW" UNDER THE UIM STATUTE WHEN A NEW CONTRACTUAL RELATIONSHIP ARISES ON OR AFTER JANUARY 1, 2001, OR MATERIAL CHANGES TO THE TERMS OF AN EXISTING INSURANCE CONTRACT ALTER THE RISK RELATIONSHIP BETWEEN THE INSURER AND THE INSURED

¶ 15 Although the plain language of the UIM Statute signals that the Legislature intended to treat new policies differently than those already in existence, the statute contains no definition of "new policy," nor does it contain any guidance for courts seeking to attach meaning to this term. And

---

3. *Li v. Enter. Rent–A–Car Co.*, 2006 UT 80, ¶ 9, 150 P.3d 471 (second alteration in original) (internal quotation marks omitted).

4. *Compare* UTAH CODE ANN. § 31A–22–305(9)(b)(i) (Supp.2000) (emphasis added) *with id.* § 31A–22–305.3(2)(b)(iii) (2010). The written-waiver requirement remains unchanged in the current version of the UIM Statute, though the statute has been amended to impose additional requirements to make that waiver effective.

5. *Id.* § 31A–22–305(9)(b)(ii)–(iii) (Supp.2000); *see also id.* § 31A–22–305.3(2)(b)(iv)–(v) (2010).

6. *Compare id.* § 31A–22–305(9)(b) (Supp.2000) (emphasis added) *with id.* § 31A–22–305.3(2)(b) (2010).

7. *Id.* § 31A–22–305(9)(g) (Supp.2000). The current version of the UIM Statute no longer contains this requirement. We do not opine as to the renewal notification requirements for policies that are not "new" under the current statute.

from the plain language of the statute, the meaning of "new policy" is far from apparent. Read narrowly, "new policy" could be limited to only new contractual relationships and would limit the obligation of insurers to obtain waivers from only new customers entering insurance contracts for the first time. Just as reasonable, however, is a broader definition of "new policy." Under this interpretation, an insured could possess a new policy if the terms of a policy existing on or after January 1, 2001, change in such a material way that the relationship of risk between the insurer and insured has little resemblance to the original policy.[8] Because the term "new policy" is ambiguous, we turn to other interpretive tools to assign meaning to this term.[9] In doing so, we conclude that the legislative history and policy considerations underlying the UIM Statute support a broader definition of "new policy" that includes not only new contractual relationships but also material changes to an existing policy that alter the risk relationship between the insurer and the insured.

¶ 16 In *General Security Indemnity Company of Arizona v. Tipton*,[10] the Utah Court of Appeals examined the UIM Statute's legislative history, which reveals that the statute was passed in response to an urgent concern that citizens of the state did not understand the consequences of not carrying uninsured or underinsured motorist coverage.[11] Specifically, the court of appeals quoted from the floor debates of the Utah House of Representatives:

> When we buy insurance for our cars, and we purchase the amount that we can refer to as the "liability amount," ... consumers generally don't understand that that's a package that you buy, and they believe that when they're buying that coverage, that's taking care of themselves or their family. That's not the case.
>
> ...
>
> What this bill does is [*sic*] says, when you're purchasing insurance ... the underinsured coverage will be the same as the liability coverage you have, unless you choose not to take that. But what [the bill] presumes, is that the levels will be the same, so that the consumer gets what they believe they're buying, or they understand what they're buying, and ... it provides a way that if you don't want that, then you can sign a waiver saying "I recognize I'm taking a lesser amount of underinsured coverage."
>
> So, it is not mandating any coverage onto a consumer, but it is *affirmatively informing* them, and showing that ... they're taking less coverage.[12]

¶ 17 These legislative statements reveal that this statute was designed to *affirmatively inform* consumers about UM/UIM coverage by allowing them to sign a waiver saying, "I recognize I am taking a lesser amount of

8. Many other jurisdictions that have interpreted similar UM/UIM statutes have found that material changes to an existing insurance contract can create a new policy for the purpose of triggering the statutory requirement to reoffer UM/UIM insurance or obtain a waiver from the insured. *See, e.g., Matheny v. Glen Falls Ins. Co.*, 152 F.3d 348, 354 (5th Cir.1998); *Allstate Ins. Co. v. Kaneshiro*, 93 Hawai'i 210, 998 P.2d 490, 497 (2000); *Nicholson v. State Farm Mut. Auto. Ins. Co.*, 409 Ill.App.3d 282, 350 Ill.Dec. 874, 949 N.E.2d 666, 672–75 (Ill.App.Ct.2010); *Richardson v. Lott*, 928 So.2d 567, 569 (La.Ct.App.2006); *Folstad v. Farmers Ins. Exch.*, 297 Minn. 496, 210 N.W.2d 238, 240 (1973) (per curiam); *May v. Nat'l Union Fire Ins. Co.*, 918 P.2d 43, 44 n. 2 (Okla.1996); *Beauchamp ex rel. Beauchamp v. Sw. Nat'l Ins. Co.*, 746 P.2d 673, 676 (Okla.1987); *Koop v. Safeway Stores, Inc.*, 66 Wash.App. 149, 831 P.2d 777, 779–80 (1992).

9. *See, e.g., Arbogast Family Trust v. River Crossings, LLC*, 2010 UT 40, ¶ 19, 238 P.3d 1035

(quoting *In re Worthen*, 926 P.2d 853, 866–67 (Utah 1996)) (stating that when a statutory "provision is ambiguous we may look beyond the plain language to 'historical evidence' and 'policy arguments' for further direction"); *Harvey v. Cedar Hills City*, 2010 UT 12, ¶ 15, 227 P.3d 256 (same).

10. 2007 UT App 109, 158 P.3d 1121.

11. *Id.* ¶¶ 11–13. While the court of appeals primarily addressed UM coverage, the 2000 version of the UIM Statute discussed in *Tipton* referred to both UM and UIM coverage. *See id.* ¶ 11 n. 6; *see also* Utah Code Ann. § 31A–22–305 (Supp. 2000).

12. *Tipton*, 2007 UT App 109 ¶ 11, 158 P.3d 1121 (alterations in original) (footnote omitted) (quoting House Floor Debate on S.B. 189, 53rd Leg., Gen. Sess. (Mar. 1, 2000) (statement of Rep. Koehn)).

underinsured coverage." [13] This suggests that the statute's scope is broad and requires that *current* insurance owners are presented with the information they need to make an informed decision about UM/UIM coverage. If "new policy" is read narrowly, few current insurance policyholders will have the opportunity to sign a waiver. Indeed, the opportunity to sign a waiver would arise only if a current insurance policyholder's contract lapses or if the insured switches insurance providers; the majority of policyholders will not fall into these categories.

¶ 18 A broader definition of "new policy" is also supported by the changing nature of insurance policies over time in response to life circumstances. For instance, consider a single driver in his late twenties paying a $75 premium each month with a $100,000 liability limit. If "new policy" is read narrowly, then this driver would have the same policy under the statute even if he marries, years pass, he insures his three teenage children, and he pays $300 premiums with a $250,000 liability limit. While most individuals would consider the second policy to be a different policy than the first, a narrow interpretation of "new policy" would treat them as the same "policy" under the statute, and the driver would receive a description of UM/UIM coverage only with his renewal notice despite the passage of time and the significant changes to the original policy. This form of communication does not give drivers the same chance to "affirmatively" consider obtaining UM/UIM coverage as would be available through the waiver process. We do not believe that the Legislature intended the definition of "new policy" to be this narrow.

¶ 19 Finally, a broader definition of "new policy" is supported by public policy. As a society, we depend on insurance. At its core, insurance is a product designed to manage risk. We have an interest in protecting people who endeavor to use the insurance system to manage this risk. We want them to make informed decisions. And when life presents new risk to the insured, we conclude that the Legislature has formulated a rule that allows the insured to reconsider her insurance situation in a direct and meaning-ful way. We believe that the Legislature intended the term "new policy" under the statute to be broad enough to achieve its stated educational goals and to be interpreted in a way that allows the maximum number of insureds to read and sign a document that emphasizes the potentially catastrophic consequences associated with choosing not to purchase UM/UIM coverage.

¶ 20 For the foregoing reasons, we conclude that an individual has a "new policy" under the statute if she enters a new contractual relationship with an insurer, or if there is a material change in her existing policy. We believe that this approach most effectively achieves the increased education and informed decision making the Legislature intended. It allows people to reconsider their insurance coverage in response to life changes that may alter how much risk they are willing to bear.

## III. CHANGES TO AN EXISTING INSURANCE POLICY ARE MATERIAL WHEN THE CHANGES MEANINGFULLY ALTER THE RISK RELATIONSHIP BETWEEN THE INSURER AND THE INSURED

¶ 21 Having concluded that material changes to a policy can trigger the insurer's obligation to obtain a waiver from the insured, we now examine what changes to an existing contractual relationship are sufficiently material to create a "new policy" under the statute. In the briefing before this court, the parties focus heavily on the changes in this case—specifically whether State Farm's change in its policy booklet, issuance of a new policy number, and the Iversons' addition of a 2001 PT Cruiser constituted material changes to the policy. Ms. Iverson asks us to conclude that these changes are material enough to create a new policy. State Farm urges us to conclude that the post–2001 changes to the Iversons' policy are minor in character and did not create a new policy.

¶ 22 We decline the parties' invitation to examine the specific alterations to the

**13.** *Id.*

Iversons' policy for two reasons. First, to opine on the specific changes to the Iversons' policy would improperly resolve the underlying factual dispute between the parties. This is the task of the federal district court.[14] Second, although other jurisdictions have approached this question by categorically labeling particular types of changes to a policy as either material or nonmaterial, we conclude that this approach ignores the specific factual circumstances and risks faced by each individual policyholder. Thus, we conclude that we cannot categorically say that a particular change is always material or immaterial. Rather, to determine whether a change to an existing policy is so material that it creates a new policy under the statute, the totality of the circumstances must be considered. In this analysis, the primary focus should be on whether the change to the policy would meaningfully alter the risk relationship between the insurer and the insured. Relevant, but not determinative, considerations may include:

1. Whether the change to the policy was one requested by the insured or a routine or ministerial change made by the insurance company.[15]

2. Whether in response to the change, the average insured would want to re-evaluate the amount of risk she would be willing to bear under the policy. And

3. Whether the character of the changes would lead the average insured to believe she was receiving a new policy.

We conclude that these questions, along with any other relevant considerations focused on the type of changes made to the policy, will help courts determine whether an individual has a "new policy" under the UIM Statute such that an affirmative waiver of UIM coverage is required.

## CONCLUSION

¶ 23 Our answer to the certified question is that an insurer can provide UIM coverage in lower amounts than liability coverage so long as the insurer has complied with the UIM Statute's consumer notification requirements. These requirements differ depending on whether the policy in question is a "new policy" on or after January 1, 2001. For the purposes of the statute, a "new policy" exists if a new contractual relationship is entered or if material changes are made to the terms of an existing insurance contract that alter the risk relationship between the insurer and the insured. For such new policies, the statute requires that the insurer obtain either a written waiver from the insured or provide UIM coverage in an amount equal to the lesser of the limits of the insured's motor vehicle liability coverage or the maximum UIM coverage limits available by the insurer under the insured's motor vehicle policy.

¶ 24 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Judge ADKINS concur in Justice NEHRING's opinion.

¶ 25 Due to his retirement, Justice WILKINS did not participate herein; District Court Judge ROBERT W. ADKINS sat.

¶ 26 Justice THOMAS R. LEE became a member of the court on July 19, 2010, after oral argument in this matter, and accordingly did not participate.

**14.** See Egbert v. Nissan Motor Co., 2010 UT 8, ¶ 8, 228 P.3d 737.

**15.** Lovoi v. Ladreyt, 655 So.2d 387, 389 (La.Ct. App.1995) ("The jurisprudential trend requires a new waiver when the insured has requested a change in either the insured person, vehicle, risks, or coverage limits.") (emphasis omitted), superceded by statute as stated in Am. Deposit Ins. Co. v. Myles, 783 So.2d 1282 (La.2001).