HEADNOTE:     *Lashawn Duckett-Murray v. Encompass Insurance Company of America*, No. 1812, September Term, 2016

**PRIVATE PASSENGER MOTOR VEHICLE INSURANCE — UNINSURED MOTORIST (UM) COVERAGE — STATUTORY REQUIREMENT OF EQUALITY OF LIABILITY AND UM COVERAGE — INSURANCE ARTICLE SECTIONS 19-509(e)(2) AND 19-510(b)(1) — MATERIAL CHANGES IN POLICY UPON RENEWAL THAT ARE TANTAMOUNT TO NEW POLICY**

In 2014, insured under private passenger automobile policy ("policy") was injured in an accident caused by an uninsured motorist. The policy originally was issued in 1987 to her grandfather, grandmother, and aunt.

In 1992, the General Assembly amended the Insurance Article to require that, for private passenger automobiles, UM limits must equal liability limits, unless the named insured waives equality of coverage in writing. Uncodified section 2 of the 1992 equality of coverage law provided that it "shall apply only to motor vehicle insurance policies issued or delivered on or after" October 1, 1992.

In the more than twenty years after the policy first was issued, it was renewed annually with many changes, including that insureds were removed, as they died, and others insureds, including the insured in this case and her mother, were added. The named insured changed over the years, and insured vehicles were added and removed.

After the insured's insurance company ("company") declined her demand for payment of damages in excess of her $75,000 stated UM limits, up to her $300,000 liability limits, she sued the uninsured driver for negligence and the company for breach of contract. Partial summary judgment was granted in favor of the company, on the ground that because the policy merely was renewed from year to year, it was not a policy "issued or delivered" after October 1, 1992, within the meaning of uncodified section 2, and therefore was not controlled by the 1992 equality of coverage law. The negligence case against the uninsured motorist resulted in a jury verdict in favor of the insured in an amount above the stated UM limits and below the liability limits in the policy.

Insured appealed the grant of partial summary judgment in favor of the company, arguing that the changes in the policy over time made it effectively new and therefore a policy "issued or delivered" after October 1, 1992, and subject to the equality of coverage law. The company responded that the trial court ruled correctly that the policy simply was renewed over a long period of time and was not new.

*Held*: Judgment reversed. As the parties acknowledge, uncodified section 2 cannot mean that all policies issued or delivered after October 1, 1992, including standard renewal policies, are within the equality of coverage law, because the legislature would

not have included "only" as a word of limitation if that were the case. The meaning of uncodified section 2 otherwise is not clear. It must be ascertained in light of the purpose of the 1992 equality of coverage law, which was to maximize the number of auto insurance customers who would have UM coverage equal to liability coverage by making that the default coverage situation, unless affirmatively waived. Looking to other jurisdictions that have addressed the question of when a policy is "new" for purposes of similar equality of coverage laws, Court holds that when there has been a material change in the risk relationship between the insurer and the insured under the policy, considering the totality of the circumstances, the policy effectively is new and an equal coverage provision will be read into it.

Because there is no dispute over the underlying facts, whether the policy was issued or delivered after October 1, 1992, *i.e.*, was effectively new after that date, can be answered as a matter of law. In the 1998 to 2000 renewal periods, there were three major changes in the policy that were material: the original named insured died; the new named insured was added to the policy as the named insured and for the first time as a driver; and the number of vehicles covered was reduced from three to two. These changes were material in that they altered significant terms, introduced a new decision-maker for waiver purposes, and affected the premium charged. Accordingly, the policy effectively was "issued and delivered" within the meaning of uncodified section 2 at that time, and the equality of coverage law applied. Because there was no waiver of equal coverage, equal coverage must be implied in the terms of the policy.

Circuit Court for Prince George's County
Case No. CAL15-15643

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1812

September Term, 2016

_____

LASHAWN DUCKETT-MURRAY

v.

ENCOMPASS INSURANCE COMPANY OF
AMERICA, ET AL.

_____

Eyler, Deborah S.,
Friedman,
Wilner, Alan M.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed: January 31, 2018

In this appeal, we must examine the reach of Maryland's statutory policy in favor of equality of liability and uninsured motorist ("UM") coverage limits in private passenger automobile insurance policies.[1]

In January 2013, Michael David Haynesworth, an appellee, struck a vehicle owned and operated by Lashawn Duckett-Murray, the appellant, causing her to suffer personal injuries. Haynesworth had no motor vehicle liability insurance coverage. In the Circuit Court for Prince George's County, Duckett-Murray filed suit for damages against Haynesworth and Encompass Insurance Company of America ("Encompass"), also an appellee, her own motor vehicle liability and UM insurance carrier.

Duckett-Murray and Encompass filed cross-motions for partial summary judgment on the issue of the applicable UM limits. Duckett-Murray argued that by statute her policy's UM limits necessarily were equal to her policy's $300,000 liability limits. Encompass argued that the UM limits were $75,000, as stated on the policy declarations page. The circuit court issued a memorandum opinion and order ruling that the applicable UM limits were $75,000 and granting partial summary judgment in favor of Encompass.

---

[1] At the times relevant to this case, UM coverage included "coverage for accidents involving under-insured, as well as uninsured, motorists." *Swartzbaugh v. Encompass Ins. of Am.*, 425 Md. 614, 617 (2012) (citing *GEICO v. Comer*, 419 Md. 89, 91 n. 1 (2011)). As we shall discuss, a new law recently took effect allowing for enhanced underinsured motorist coverage in place of uninsured motorist coverage. *See* 2017 Md. Laws, ch. 20, § 2; ch. 815, § 2 (effective Oct. 1, 2017).

In a jury trial, Haynesworth was found liable to Duckett-Murray for $192,148.15 in damages. The court entered judgment against Haynesworth in the full amount of the verdict and against Encompass for $75,000.

On appeal, Duckett-Murray presents one question, which we have rephrased:

Did the circuit court err by ruling that the UM limits on her automobile insurance policy were not equal to the policy's liability limits?

We answer that question in the affirmative. We shall vacate the judgment against Encompass for $75,000 and remand the case for the court to enter judgment in favor of Duckett-Murray and against Encompass for $192,148.15.

**FACTS AND PROCEEDINGS**

By 1992, Md. Laws, Chap. 641 ("the 1992 Law"), the General Assembly amended Maryland's motor vehicle insurance laws to state that "[u]nless waived . . . the amount of [UM] coverage provided under a private passenger motor vehicle liability insurance policy shall equal the amount of liability coverage provided under the policy." Md. Code (1997, 2011 Repl. Vol., 2013 Supp.), § 19-509(e)(2) of the Insurance Article ("Ins."). To be effective, a waiver of equality of coverage must be in writing and made by the "first named insured" under the policy. Ins. § 19-510(b)(1).[2] The 1992 Law included two sections that were not codified. Section 2 stated that "[t]his Act shall apply only to motor

---

[2] The "Named insured" is "the person denominated in the declarations in a motor vehicle liability insurance policy." Ins. § 19-501(d).

The Maryland Insurance Administration ("MIA") provides a waiver form that complies with the statutory standards. Ins. § 19–510(d).

vehicle insurance policies issued or delivered on or after the effective date of this Act[,]" and section 3 established an effective date of October 1, 1992.

The accident that gave rise to the lawsuit in this case happened on January 3, 2014. At that time, Duckett-Murray was insured under a "USP Deluxe" policy from Encompass, for the policy period November 4, 2013, through November 4, 2014. Barbara Duckett ("Barbara"), Duckett-Murray's mother, was identified on the declarations page as the "Policyholder."[3] The policy covered two vehicles: a 2003 Chrysler Town & Country driven by Barbara and a 2008 Dodge Charger driven by Duckett-Murray. Barbara, Duckett-Murray, and Barbara's sister, Bertha Duckett ("Bertha"), were listed as drivers on the policy. The declarations page showed liability limits of $300,000 and UM limits of $75,000. It is undisputed that neither Barbara nor any prior policyholder ever executed a written waiver of UM coverage equal to liability coverage consistent with Ins. sections 19-509 and 19-510.

On cross-motions for summary judgment, the parties presented evidence pertinent to when the policy was "issued or delivered." That evidence showed that on October 30, 1987, Edison Duckett ("Edison"), Barbara and Bertha's father and Duckett-Murray's grandfather, applied to CNA Insurance Companies ("CNA") for a combined policy of homeowners and automobile insurance. At that time, Edison; his wife, Mary Duckett ("Mary"); Barbara, then age 33; Bertha, then age 30; and Duckett-Murray, then age 10,

---

[3] As the policy history we shall recount makes clear, the insurer at one time used the term "named insured" but later substituted the term "policyholder" in its place.

all were living at 12809 Heatherwich Court, in Brandywine. Barbara and Duckett-Murray continue to live at the Heatherwich Court residence.[4]

On November 4, 1987, "Universal Security Deluxe Policy" No. US6021509 was issued to "Named Insured[s]" "Edison and Mary and Barbara Duckett." The "New Business Coverage Summary" pages identified CNA as the insurer and Continental Casualty Company ("CCC") as the insurance underwriter. The liability limit was $300,000 and the UM limit was $50,000. Three vehicles were covered: a 1987 Chevrolet Celebrity, a 1986 Ford Escort, and a 1980 Ford Pinto. Edison, Mary, and Bertha were listed as drivers, but Barbara was not. In fact, Barbara had her own automobile insurance policy with Allstate. The only reason Barbara was included as a "Named Insured" on the policy was because it covered the Heatherwich Court residence and she was a mortgagor on the house, along with her parents.[5]

The next year, for the policy period November 4, 1988, through November 4, 1989, only Edison was listed as a "Named Insured." The policy was renewed for the policy years beginning November 4, 1988, through November 4, 1994, with Edison as

---

[4] Bertha may still live there, but the record does not address that.

[5] In the application, Edison asked that the CNA policy list "Edison, Mary, & Barbara" as the "named insured[s]" in order to "satisfy mortgagee." We take judicial notice of the State Department of Assessments and Taxation online records, which show that Barbara owned the Heatherwich Court residence jointly with her parents.

-4-

the "Named Insured" and the coverage limits, number of vehicles covered, and drivers unchanged. In policy years 1990 through 1993, various automobiles were substituted.[6]

Beginning November 4, 1995, the policy name changed from "Universal Security Deluxe Policy" to "USP Deluxe." The policy number, limits, vehicles, and drivers were unchanged. Edison remained the sole "Named Insured." Beginning November 4, 1996, the name of the policy underwriter was changed from CCC to Continental Insurance Company ("Continental").[7] The policy was renewed with no changes on November 4, 1997. On November 4, 1998, the policy was renewed but the Nissan Maxima assigned to Edison was removed and not replaced, so only two vehicles were covered, not three.

On July 30, 1999, an endorsement added Barbara as a "Policyholder" and as a driver.[8] Edison, Mary, and Bertha continued to be listed as drivers. Two vehicles were covered: one assigned to Mary and one to Bertha.

On November 4, 1999, the policy was renewed with liability limits remaining at $300,000, but with UM limits increased to $55,000, consistent with a change in the statutory minimum. Edison and Barbara remained the "Policyholders."

---

[6] In 1990, a 1990 Ford Ranger pick-up truck was substituted in place of the 1986 Ford Escort. In 1992, a 1984 Ford Escort was substituted in place of the 1980 Ford Pinto. In 1993, a 1985 Nissan Maxima was substituted in place of the 1984 Ford Escort.

[7] A 1995 Ford Windstar was added in place of the 1987 Chevrolet Celebrity. The policy number and limits remained unchanged.

[8] As noted, CNA stopped using the term "named insured" and instead used the term "policyholder."

Edison died in August of 2000. The policy was renewed on November 4, 2000, with no changes. On November 4, 2001, the policy was again renewed, still listing Edison and Barbara as "Policyholders," but not listing Edison as a driver. The policy number, liability limits, and UM limits remained unchanged, although the policy stated that it now was being issued by Glens Falls Insurance Company ("Glens Falls"). The policy was renewed on November 4, 2002, still with "Edison & Barbara Duckett" listed as the "Policyholders."

On December 23, 2002, the policy was amended by endorsement to delete Edison as a "Policyholder" and add Mary. Thus, "Barbara & Mary Duckett" were now the "Policyholders."

On November 4, 2003, Duckett-Murray, then age 26, was added as a driver, and a third vehicle, a 1993 Jeep Grand Cherokee, was added. "Barbara and Mary Duckett" remained the "Policyholders."[9] Bertha and Mary also were listed as drivers.

The "USP Deluxe Renewal Policy" for the November 4, 2004, through November 4, 2005 policy period bore a new policy number, No. #261526627, and stated that it was being issued by Encompass, "Formerly known as CNA Personal Insurance." The "Coverage Summary" page stated "Policyholder Since: 11/1987."[10] The "Policyholders" and coverage limits remained unchanged.

---

[9] A 2003 Chrysler Town & Country was added to the policy, in place of the 1995 Ford Windstar.

[10] This language also appeared on prior iterations of the policy, beginning in 1998.

The USP Deluxe Renewal policy was renewed on November 4, 2005. The "Renewal Policy Coverage Summary" states: "Policy Number: 261526627. This is a replacement of policy 006021509." It further states that the issuer is "Encompass Insurance Formerly known as CNA Personal Insurance" and includes the "Policyholder Since: 11/1987" language. The policy was renewed again on November 4, 2006, with no changes. The policy was renewed on November 4, 2007, with two vehicles covered instead of three.[11]

In December 2007, Mary died.

On November 4, 2008, the policy was renewed with "Barbara Duckett" as the sole "Policyholder." Barbara renewed the policy in 2009 and again in 2010. Beginning November 4, 2011, the UM coverage was increased to $75,000, consistent with changes to the statutory minimum, while the liability coverage remained unchanged. A third covered vehicle, a 2008 Dodge Charger, was added.

The policy was renewed on November 4, 2012, with the 1998 Dodge Stratus removed, so the policy only covered two vehicles. On November 4, 2013, the policy was renewed with no changes.

As mentioned, the accident giving rise to this lawsuit occurred on January 3, 2014, during the 2013 policy period. Duckett-Murray made a claim against Encompass for UM benefits up to the $300,000 liability limits under the policy. Encompass took the position

---

[11] A 1998 Dodge Stratus, assigned to Duckett-Murray, was added, and the 1990 Ford truck and the 1993 Jeep were removed.

that the stated $75,000 UM limits applied. Duckett-Murray filed suit against Haynesworth and Encompass on May 21, 2015.

On July 1, 2016, Duckett-Murray moved for partial summary judgment, arguing that because Ins. section 19-509(e)(2) requires UM limits to equal liability limits for a private passenger automobile insurance policy, absent an affirmative written waiver, and because neither Barbara nor any other Policyholder made such a waiver, the UM benefits recoverable under the policy automatically were up to the $300,000 liability limits. Encompass filed a timely opposition to Duckett-Murray's motion and a cross-motion for partial summary judgment. It maintained that Ins. section 19-509(e)(2) did not apply to the policy covering Duckett-Murray because that policy was not "issued or delivered" on or after October 1, 1992, having been continuously renewed since 1987.

The court heard argument on September 1, 2016, and, on September 14, 2016, entered a memorandum opinion and order. It ruled that the policy covering Duckett-Murray had been issued and delivered in 1987 and renewed continuously thereafter, opining:

> While there have been numerous changes to the policy, they are those of the routine variety. Individuals frequently change the covered drivers when necessary and change the covered vehicle when they purchase a new car. They then proceed to renew their coverage at the expiration of each term. This Court finds that is what the Duckett family did here. They renewed their motor vehicle insurance policy every November since the policy was issued in 1987. The best evidence is the most recent renewal itself that indicates "Policyholder Since: 11/1987.

The court concluded that because the policy merely was renewed yearly after it was first purchased in 1987, it was not "issued or delivered" after October 1, 1992, and, therefore,

a waiver of enhanced UM coverage limits was not required. It relied upon *World Insurance Co. v. Perry*, 210 Md. 449, 454 (1956), which holds that "a renewal of an insurance policy by the payment of a new premium and the issuance of a receipt therefor, where the renewal is in pursuance of a provision to that effect, is not a new contract but an extension of the old."

A jury trial went forward on October 3-4, 2016, and, as mentioned, the jury found in favor of Duckett-Murray, and against Haynesworth, awarding damages of $192,148.15. On October 18, 2016, the court entered judgment against Haynesworth for $192,148.15 and Encompass for $75,000. Duckett-Murray noted a timely appeal.[12]

## DISCUSSION

Duckett-Murray contends the circuit court's interpretation and application of uncodified section 2 of the 1992 Law is "inconsistent with the text and purpose of the remedial statute creating a default of matching limits of liability coverage and uninsured motorist benefits." In her view, the legislature adopted a policy that favors equality of liability and UM coverage limits, by making that the default coverage circumstance absent an affirmative written waiver; and it intended for that policy to apply to motor vehicle insurance policies such as the one here, which, although labeled as a "renewal" policy, "was not issued to the same person to whom it was issued on the effective date of" the 1992 Law and "was not issued by the same company, or an affiliated company,

---

[12] Haynesworth is an appellee, but he did not file a brief or otherwise participate in the appeal.

-9-

that issued" the policy in 1992. She maintains that because, under Ins. section 19-510(a)(1), the "first named insured" has the power to execute a waiver of enhanced UM coverage on behalf of the other insureds, any time the first named insured under the policy changes, as happened here in 2002 and again in 2008, there is a new contract, not a policy renewal. In that circumstance, equality of coverage as mandated by Ins. section 19-509(e)(2) applies, and the new first named insured must be given the opportunity to execute a waiver.[13]

Encompass responds that the circuit court correctly ruled that, for purposes of uncodified section 2, only a new policy, not a renewal policy, is a policy "issued or delivered" on or after October 1, 1992. In its view, the renewal of a policy first issued and delivered before October 1, 1992, never will trigger the equality of coverage requirement, even if the policy has been renewed multiple times and the renewals have significantly changed the policy over time. Encompass asserts that, after the policy at issue here first was issued in 1987, it became a renewal policy, to which the 1992 Law did not apply. That is so, it maintains, regardless of which named insured actually renewed the policy each year. Encompass argues that *Swartzbaugh v. Encompass Ins. of America*, 425 Md. 614 (2012), supports this position.

No Maryland case has interpreted uncodified section 2, and the UM statute does not define the phrase "issued or delivered." The words "issued," "sold," or "delivered,"

---

[13] Effective October 1, 2017, Ins. sections 19-510(a)(1) and (2) were moved to (b)(1) and (b)(2). We shall cite to the statutory sections in effect during the prior relevant time.

usually in full or partial combination, appear throughout the motor vehicle insurance title of the Code (Title 19), however. As the author of the leading treatise on Maryland motor vehicle insurance law has commented, "[t]he phrase 'issue, sell, or deliver' and its derivatives have not been given any special judicial interpretation by Maryland courts." Andrew Janquitto, *Maryland Motor Vehicle Insurance*, § 5.5 at 140 (3d ed. 2011) (footnote omitted) (hereinafter "Janquitto"). But the way in which these words are used in Title 19, subtitle 5 "suggests that 'issued' and 'sold' are synonymous," while "delivery" stands on its own. *Id.* at 140–41 (footnote omitted).

The meaning of "issued or delivered" in uncodified section 2 is not entirely clear. From 1975, when UM coverage first was mandated, those words were used broadly: "[E]ach motor vehicle liability insurance policy issued, sold, or delivered in the State after July 1, 1975, shall contain" UM coverage as further described. Ins. § 19-509(c). Likewise, they have been used broadly from 1972 on, in mandating minimum liability coverage amounts: "Each motor vehicle liability insurance policy issued, sold, or delivered in the State shall provide the minimum liability coverage specified in Title 17 of the Transportation Article." Ins. § 19-504. As the Janquitto treatise points out, because insurance contracts are said to come into existence when sold and delivered, these words may have been used to make clear, for conflict of laws purposes, that any insurance policy formed in the State of Maryland after the effective date of those statutory mandates would need to provide the minimum liability and UM coverages. Janquitto, at 141. There is no case law or history to suggest a distinction between new and renewal policies in that context.

-11-

The words "issued or delivered" in uncodified section 2 are not as broadly phrased as in Ins. sections 19-509(c) and 19-504, however, given the use of the word "only" in that section. Rather, they seem to have been meant as a limitation upon the insurance policies to which the 1992 Law would apply. "This Act shall apply *only* to . . . policies issued or delivered on or after" October 1, 1992, implies that there are policies to which the Act will not apply, *i.e.*, those not issued or delivered on or after that date. (Emphasis added.)

The parties to this appeal are in agreement that the limitation envisioned by the General Assembly in uncodified section 2 applies to ordinary renewal policies. That is, a routine renewal policy is not a policy "issued or delivered" within the meaning of section 2. Maryland law is well-established that when an insured renews a policy that permits renewal, and the insurer accepts the renewal, the resulting policy merely is a continuation of the already existing policy. *World Insurance Co. v. Perry, supra*. We agree with the parties that it is unlikely that the legislature generally intended renewal policies to be included among the policies "issued or delivered" on or after October 1, 1992, as that would have eliminated any distinction, for purposes of UM limits, between policies sold or delivered before October 1, 1992, and policies sold or delivered on or after that date. The question is whether there can be circumstances in which a renewal policy that is issued or delivered has changed so much from the policy as originally sold that it is, in effect, a new policy. Duckett-Murray urges a broad reading of uncodified section 2 to that effect, while Encompass urges a narrow reading, so that only a new contractual

relationship with a new customer is a policy "issued or delivered" under uncodified section 2.

In determining the meaning of uncodified section 2, we must "ascertain and effectuate the intent of the General Assembly." *Bottini v. Dep't of Fin.*, 450 Md. 177, 187 (2016). In so doing,

> we look first to the language of the statute [or here, the uncodified provision of the law], giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends.
>
> If the language of the statute is ambiguous, however, then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives, and the purpose of the enactment under consideration. We have said that there is an ambiguity within a statute when there exist two or more reasonable alternative interpretations of the statute. When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.

*Id*. at 187–88 (citation omitted).

It is evident from the history of the Maryland UM law from its inception until enactment of the 1992 Law that the General Assembly's objective has been to maximize the number of consumers who purchase UM coverage in excess of the statutory minimum

-13-

amount. As noted, since 1975, private passenger automobile insurance policies issued in Maryland have been required to provide minimum levels of UM coverage. *See* 1975 Md. Laws, Chap. 562; *see also Swartzbaugh v. Encompass Ins. of Am.*, 201 Md. App. 133, 143–46 (2011) (discussing the legislative history of mandatory UM coverage in Maryland). In 1981, the General Assembly went a step further, requiring insurers to "make available" to insureds UM coverage above the minimum levels, so long as that coverage did not exceed the amount of liability coverage under their policies. 1981 Md. Laws, Chap. 510. (It also expanded UM coverage to include certain underinsured motor vehicles.)

In 1989, the General Assembly tried to put teeth in that law, changing it to "require insurance companies to offer *in writing* the opportunity to contract for higher amounts of [UM] coverage." *Swartzbaugh*, 201 Md. App. at 145 (emphasis in original). And finally, when it became evident that a law that placed the burden on consumers to act to increase their UM limits could not be made strong enough to be effective, the General Assembly enacted the 1992 Law, shifting the burden to insurers to provide UM coverage equal to liability coverage unless equal UM coverage was affirmatively waived in writing.[14] As this Court explained in *Swartzbaugh*,

---

[14] While the instant litigation was pending, the General Assembly enacted a new law requiring insurers to offer their insureds enhanced underinsured motorist coverage ("EUIM") in lieu of traditional UM coverage. *See* 2017 Laws of Md., ch. 20, § 2, ch. 815, § 2. That law, which took effect on October 1, 2017, and is now codified at Ins. section 19-509.1, amended the affirmative waiver requirement of Ins. section 19-510 to make it inapplicable to any policy that includes EUIM coverage in lieu of UM coverage.

(Continued…)

the impetus behind the 1992 amendment was the lack of awareness regarding the importance of carrying uninsured motorist coverage in an amount equal to the policy's liability coverage. By requiring the insured to affirmatively waive higher uninsured motorist coverage, an "insured's inaction [wa]s more protection," and the "'default setting' recognize[d] the realities of life and dovetail[ed] with the legislative aim of [uninsured motorist] coverage—a full recovery."

201 Md. App. at 146 (quoting Janquitto, § 8.7 at 334). *See also Staab v. Am. Motorists Ins. Co.*, 345 Md. 428, 435–36 (1997) (observing that the General Assembly "has determined, as a general policy, that insureds should have the same amount of [UM] coverage as they have automobile liability coverage, unless they affirmatively waive the equivalent level over and above the mandatory minimum[.]")

Generally, because the UM statute is "remedial" legislation, we must construe it liberally "'in order to effectuate its purpose of assuring recovery for innocent victims of motor vehicle accidents.'" *Nationwide Mut. Ins. Co. v. Webb*, 291 Md. 721, 737 (1981) (quoting *State Farm v. Md. Auto. Ins. Fund*, 277 Md. 602, 605 (1976)). More specifically, we must construe the meaning of "issued or delivered" in uncodified section 2 in light of the public policy underlying UM coverage, which has evolved to afford greater protection, through the private sector, to those injured by uninsured motorists:

Before 1981, the public policy was to place the insured in the same position he or she would have occupied had the uninsured motorist maintained liability limits in the amount mandated by Title 17 of the Transportation

(…continued)
Traditional UM coverage will only pay up to the UM limits, minus any liability coverage under the at-fault driver's policy. EUIM coverage, in contrast, pays "in addition to the limits of liability" under any valid and collectible liability coverage, and up to the full damages sustained. H.B. 5 (2017), Fiscal Note at 6.

Code. The public policy behind today's UM statute is to place the insured in the same position he or she would have occupied had the tortfeasor maintained liability limits equal to the claimant's own UM coverage . . . . Today's UM statute is designed to provide the insured the opportunity to secure a *full* recovery for his or her injuries. The General Assembly enables the insured to purchase UM insurance greatly in excess of the minimum limits mandated by Title 17 . . . , and, once purchased, that coverage is inviolable (unless the UM statute expressly permits such a violation). In this sense, the insured has the opportunity to secure a full recovery if he or she purchases higher UM limits.

Janquitto, § 8.1 at 310 (emphasis in original).

As noted, Encompass relies upon *Swartzbaugh* to support its position that, contrary to what Duckett-Murray argues, significant changes in the "named insured" do not create a new policy so long as the policy has been continuously renewed. In *Swartzbaugh*, the Court of Appeals held that "first named insured" under Ins. section 19-510 means any of the named insureds on the policy declarations page. There, a husband and wife both were listed as "Policyholders" on the declarations page, with the husband's name first. The wife signed a UM coverage limits waiver as the "first named insured," consistent with Ins. section 19-510, electing UM coverage limits less than liability limits (and therefore a lower annual premium). When the couple's daughter, who was insured under the policy, was injured in an accident caused by an underinsured driver, she brought a declaratory judgment action seeking a ruling that her mother's waiver of UM coverage equal to liability coverage was ineffective because her mother was not the "first named insured" on the policy. The circuit court and this Court rejected that argument.

In affirming, the Court of Appeals noted that "first named insured" is not defined in the Insurance Article, but "named insured" is defined and means "the person

denominated in the declarations in a motor vehicle liability insurance policy." Ins. § 19-501(d). The Court concluded that "in the context of a motor vehicle insurance policy, the phrase 'first named insured' refers to a person insured under the policy and specifically named in the policy, who acts on behalf of the other insured parties and is designated as such in the policy documents." *Swartzbaugh*. 425 Md. at 616. The Court reasoned that it would make little sense if who could waive equal UM coverage limits turned on the order in which the named insureds were listed. Because the wife was *a* "named insured" under the policy, she could act on behalf of the other insureds by signing the UM waiver, and therefore the waiver was effective.

*Swartzbaugh* is pertinent but not on point. It clarifies that when more than one person is listed as a named insured on a policy declarations page, any one of them may execute a written waiver of equality of liability and UM limits on behalf of the other insureds. One could conclude from the Court's holding that, because more than one named insured has authority to waive equal limits, the elimination of one named insured from the policy is not a significant change. *Swartzbaugh* does not give guidance on the question whether a complete turnover of named insureds, and other changes to a policy over time, can effectively result in the creation of a new policy so as to trigger the statutory requirement of equality of coverage. Other states have considered this issue and we look to some of those cases for guidance.

In *Iverson v. State Farm Mutual Insurance Company*, 256 P.3d 222, 223 (Utah 2011), the Supreme Court of Utah answered a certified question from the United States District Court for the District of Utah about Utah's equality of coverage law, which is

-17-

similar to Maryland's law. The Utah law states that "new policies written on or after January 1, 2001," "shall" provide equal UM and liability coverage unless equal UM coverage is affirmatively waived in writing. *Id*. at 225 (quoting Utah Code Ann., § 31A–22–305(9)(g)). For policies that are not "new," insurers only are required to send their insureds an insert with renewal notices explaining the purpose of UM coverage and the costs associated with increasing that coverage.

Mr. and Mrs. Iverson purchased motor vehicle insurance from State Farm beginning in 1981 and renewed their policy continuously thereafter through the 2004-2005 policy year. Beginning in February 2001 and for the following four renewal terms, State Farm sent the Iversons an insert about UM coverage along with their renewal notices. In August 2001, State Farm changed the Iversons' policy number consistent with a change in its standard policy booklet. In April 2003, the Iversons added a new vehicle to their policy, and "State Farm issued a new policy number to reflect this final change[.]" *Id*. at 223. At all relevant times, the Iversons had liability coverage limits of $50,000 for one person and $100,000 for two or more persons and UM coverage limits of $20,000. "At no point during its twenty-four year insurance relationship with the Iversons did State Farm obtain a written waiver . . . affirmatively authorizing [it] to issue [them UM] coverage in an amount less than their liability coverage." *Id*. at 223–24.

In July 2005, the Iversons were killed in a collision with an uninsured motorist. The personal representative of their estate demanded payment of $100,000 in UM benefits from State Farm. State Farm declined and paid only the UM policy limits of $20,000. The personal representative sued State Farm in federal district court, and that

court certified to the Utah Supreme Court the question whether the State Farm policy complied with Utah law. To answer, it was necessary to determine when a "new policy exists." *Id.* at 223. The term "new policy" was not defined in the statute, and its meaning was "far from apparent." *Id*. at 225–26. The court noted that the term could be read narrowly, to refer to "new contractual relationships" only, or broadly, to include policies that existed before January 1, 2001, but that had been "change[d] in such a material way that the relationship of risk between the insurer and the insured has little resemblance to the original policy." *Id*. at 226.

Looking to the legislative history and the policy goals of the UM statute to ascertain legislative intent, the court adopted the broader definition. It emphasized the remedial purposes of the change in the UM law effected by the statute. The enactment was the legislature's response to an "urgent concern that citizens of the state did not understand the consequences of not carrying [UM coverage]." *Id*. at 226. The court expressed concern that, were it to read "new policy" narrowly, "few current insurance policyholders w[ould] have the opportunity to sign a waiver." *Id*. at 227. "Indeed, the opportunity to sign a waiver would arise only if a current insurance policyholder's contract lapses or if the insured switches insurance providers; the majority of policyholders will not fall into these categories." *Id*.

The court reasoned further that "the changing nature of insurance policies over time" militated in favor of a broad construction of "new policy." *Id*. It gave as an example a policy with $100,000 in liability limits purchased by a single driver in his twenties. Under a narrow construction of "new policy," if, over twenty-five years, the

driver married, had children, and insured his spouse and his teenage children under the policy, paying a much higher premium and raising his liability limits, he still would not have a "new policy." In the court's view, that result would defy common sense.

The court next considered "what changes to an existing contractual relationship are sufficiently material to create a 'new policy.'" *Id*. It declined to decide whether the specific changes to the Iversons' policy were "material," concluding that that issue was for the district court to decide. It also declined to adopt a categorical approach to the materiality standard, holding instead that courts must consider the "totality of circumstances" in assessing the materiality of a policy change. *Id*. at 228. It advised that in making that assessment, the "primary focus should be on whether the change to the policy would meaningfully alter the risk relationship between the insurer and the insured." *Id*. "Relevant, but not determinative, considerations may include": 1) whether the policy change was requested by the insured or simply was a ministerial change; 2) whether in light of the policy change the "average insured would want to reevaluate the amount of risk she would be willing to bear"; and 3) whether the average insured would understand the policy change as creating a new policy. *Id*.

*Allstate Ins. Co. v. Kaneshiro*, 998 P.2d 490 (Haw. 2000), also is instructive. In 1974, Clyde Kaneshiro (Clyde), who was unmarried, purchased an automobile insurance policy from Allstate. Four years later, he married and his wife (Kaneshiro) was added to the policy as a driver. Twelve years later, in 1990, Allstate offered him UM coverage, which he rejected in writing. Effective January 1, 1993, Hawaii state law changed so that in some situations insurers were required to give their insureds the "option to select [UM

coverage] . . . up to but not greater than the bodily injury liability coverage limits in the insured's policy." *Id*. at 212 (quoting Hawaii's Revised Statutes § 431:10C-301(d) (1993)). One such situation was when a policy was "first applied for or issued." *Id*. However, for "existing policies, an insurer [was required to] offer such coverage at the first renewal after January 1, 1993[,]" and thereafter, "no further offer [was] required to be included with any renewal or replacement policy issued to the insured." *Id*. (emphasis omitted).

In compliance with the new law, Allstate made another offer of UM coverage to Clyde on March 1, 1993, his first renewal date after January 1, 1993. Clyde signed a written waiver rejecting that coverage. Allstate issued a renewal policy to Clyde in February 1994. On March 3, 1994, he requested several amendments to the renewal policy. Most significantly, he advised his insurance agent that he and Kaneshiro were separated and were in the process of getting a divorce and asked that his name be removed from the policy and that Kaneshiro be substituted in his place as the named insured. After he signed a release, a renewal policy was issued in Kaneshiro's name only, with that change made retroactive to March 1, 1994.

Kaneshiro renewed the policy on September 1, 1994, adding another vehicle. On September 10, 1994, she was injured in a car accident. Allstate denied her claim for UM benefits and then filed a declaratory judgment action in federal district court. Kaneshiro counterclaimed. The federal district court certified to the Supreme Court of Hawaii the question whether an insurer that already had made an offer of enhanced UM coverage to

its insured after January 1, 1993, must reoffer enhanced UM coverage if the named insured is removed and replaced with a new named insured.

The Hawaii Supreme Court answered the certified question in the affirmative. It explained that the central dispute was whether the policy issued to Kaneshiro on March 1, 1994, was a new policy or merely a "renewal or replacement policy." After reviewing cases from around the country, the court held that "when a material change is made to an existing policy, the resulting policy is not a 'renewal or replacement policy' and a new offer of [UM] coverage is required." *Id*. at 217. The materiality determination is "fact specific" based upon the "totality of the circumstances." *Id*.

Applying that test to the facts before it, the court determined that the substitution of Kaneshiro for Clyde as the insured on the policy, coupled with the addition of a new vehicle, was a material change to the policy that triggered the statutory requirement of a new offer of UM coverage. In so deciding, the court emphasized the remedial purpose of the UM statute, explaining that, under the circumstances, requiring a new notice would advance the legislative goals of informing consumers of their UM coverage rights and ensuring that consumers will make choices with adequate knowledge. The requirement would not cause insurers to incur additional costs when merely issuing renewal or replacement policies that have not changed in any material respect. The court stressed that Kaneshiro's substitution for Clyde altered the relationship between Clyde and Allstate, in that he was no longer insured; and altered the relationship between Allstate and Kaneshiro, in that she became a named insured. The addition of a new vehicle also was a material change because it caused the premium to increase by more than $200.

The court concluded that Allstate had been required to make a new offer of enhanced UM coverage to Kaneshiro and, because it had failed to do so, UM coverage in an amount equal to the liability coverage would be implied in the policy as a matter of law.

Other courts likewise have adopted a "materiality" standard to assess whether a renewal policy is tantamount to a new policy for purposes of applying UM equality of coverage laws. *See Matheny v. Glen Falls Ins. Co.*, 152 F.3d 348 (5th Cir. 1998) (applying Louisiana's "materiality standard" to hold that the addition of a married couple's teenage son to an existing policy resulted in a "new policy," not a mere "substitute policy"); *Johnson v. Farmers Ins. Co.*, 817 P.2d 841 (Wash. 1991) (*en banc*) (applying a materiality standard and holding that the substitution of one spouse for the other after the parties separated was not a material change absent a change in coverage levels); *State Farm Mutual Ins. Co. v. Arms*, 477 A.2d 1060 (Del. 1984) (applying a materiality standard and holding that the addition of a newly purchased vehicle to a policy, coupled with a change in coverage limits, was a material change that made the policy a "new policy" within the meaning of the UM statute). *But see Atlanta Casualty Co. v. Evans*, 668 So.2d 287 (Fla. Dist. Ct. App. 1996) (holding that a Florida statute made clear that an offer of UM coverage did not need to be made based upon a material intervening change in an existing policy); *Allstate Ins. Co. v. Parfrey*, 830 P.2d 905, 913 (Colo. 1992) (*en banc*) (holding that Colorado's UM statute did not impose a duty on insurers of "notification and offer . . . [whenever] an insured makes a 'material change' in coverage—whether by modifying liability limits or by adding or substituting vehicles").

For many of the same reasons expressed by the courts in *Iverson* and *Kaneshiro*, we conclude that a narrow interpretation of uncodified section 2 to limit equality of coverage to policies of new business "issued or delivered" on or after October 1, 1992, will undermine the General Assembly's purpose in enacting Ins. section 19-509(e)(2). The change in the law to make equality of liability and UM coverage the rule, and inequality of coverage the exception, was major and was aimed at providing full recovery to the highest number of victims of uninsured and underinsured motorists, with the financial risk and burden being borne by the private sector.

Uncodified section 2 must be read to further the legislative goal to expand the number of victims eligible for full recovery by means of equal UM benefits. Therefore, for purposes of the equality of coverage statute, changes to a policy that alter the level of risk insured, or introduce new decision-makers, so as to remove the policy from being a mere continuation of coverage, should not be treated differently from "new business" policies. Accordingly, a policy "issued or delivered" on or after October 1, 1992, as that phrase is used in uncodified section 2, either is a policy of new business or an existing policy that through renewals has materially changed so as to "meaningfully alter the risk relationship between the insurer and the insured." *Iverson*, 256 P.3d at 228.

The "materiality" inquiry necessarily will depend upon the unique facts of each case considered in light of the totality of the circumstances. In some cases, the facts pertinent to whether changes to a policy are material, so as to effectively create a new policy for purposes of equality of UM coverage, will be in dispute, requiring a decision by the trier-of-fact. Here, the facts are not in dispute, and therefore we shall consider

whether they constitute a material change as a matter of law. We conclude that a multitude of significant changes in the policy after October 1, 1992, resulted in a materially altered policy issued and delivered—and not simply renewed—after that date, requiring Encompass to make Barbara an offer of UM coverage equal to liability coverage, which it did not do.

The policy of insurance was renewed 22 times after October 1, 1992, and before the accident. Before October 1, 1992, Edison was the Policyholder, he and Mary and Bertha were the drivers, and the policy covered three vehicles, one for each driver. From November 1998, through November 2000, there were three major coverage changes. Edison's vehicle was removed (November 1998), so that only two vehicles were covered; Barbara was added as a Policyholder and a driver (July 1999); and Edison died and therefore no longer was a driver or Policyholder (August 2000). From the time of Edison's death in 2000 until Mary was added as a Policyholder in 2002, Barbara, who had not had any involvement with the policy before the 1992 Law went into effect, was the sole Policyholder in a position to make any decisions about the policy. (Edison was listed as a Policyholder after his death, but obviously could not make decisions). Moreover, in that same time period, the risks covered changed, as Edison no longer was a driver, his vehicle was not covered, and the policy covered only two vehicles, not three. (Indeed, the number of vehicles covered did not return to three until Duckett-Murray was added to the policy in November 2003.)

The changes in risks covered in that period of time were reflected by premium changes as well: from November 4, 1999, to November 4, 2001, the premium for motor

vehicle insurance under the policy decreased by $821. That means that during the time that Barbara was effectively the sole Policyholder—after Edison died and before Mary was added as a Policyholder—expanded UM coverage equal to liability coverage might not have resulted in a premium increase and it would have been Barbara's sole decision whether to execute a waiver of equal coverage.[15] Thus, the risks covered were meaningfully altered and the decision about a waiver was in the hands of someone with no connection to the policy before equality of coverage became the law on October 1, 1992.

There were many other significant changes to the policy in subsequent years. Indeed, by the time of the policy year in which the accident happened, Mary had died and Barbara was the sole Policyholder; Duckett-Murray, who was not an insured driver in 1992, was a driver and her vehicle was covered; the policy again insured three vehicles; and none of those vehicles had been covered under the policy in 1992. Bertha was the only driver under the 1992 policy who still was a driver under the policy at the time of the accident. The insuring company had changed (although there is no evidence as to why), as had the policy number. We are not suggesting that these changes, in and of

---

[15] The waiver form provided by the MIA includes a one-page "Notice" explaining the benefits of UM coverage and the status of the law and a one-page "Waiver of Increased Limits of Uninsured Motorist Coverage in Maryland." The Waiver page is completed by the insurer to reflect the default benefits available and the premium, as well as the benefits elected by the consumer and the premium for the lesser benefits. *See* "Notice and Waiver of Increased Limits of Uninsured Motorist Coverage," available at https://perma.cc/8YGZ-U4J8 (last visited on Nov. 22, 2017).

themselves, would not have been sufficient to make the policy effectively "new." We conclude, however, that the changes in the policy during the 1998 through 2000 period took it out of the category of a routine renewal policy and triggered application of equality of coverage under Ins. section 19-509(e)(2). They were major material changes that altered the risks insured and the decision-makers and would have justified the insureds' thinking that the policy was new.[16]

Because there was no waiver, the Policy must be treated as providing UM coverage limits equal to the $300,000 liability limits, as a matter of law. Ins. § 19-510(b)(2). The circuit court erred by granting partial summary judgment to Encompass on the issue of UM limits under the Policy. We shall vacate the $75,000 judgment against Encompass. On remand, the court shall enter a revised judgment in favor of Duckett-Murray and against Encompass for $192,148.15.

> **JUDGMENT AGAINST APPELLEE ENCOMPASS VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY TO ENTER NEW JUDGMENT AGAINST ENCOMPASS IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE ENCOMPASS.**

---

[16] We note that, in any given case, regardless of whether there has been a material change in a policy, there is nothing to prohibit the insurer from providing the notice and opportunity to waive in accordance with Ins. sections 19-509 and 19-510. Indeed, when because of some changes to a policy there is even the prospect of a dispute, it may be prudent for the insurer to do so.